*2 The opinion of the Court was delivered by
Frost, J.
James Means, the testator, died in November, 1847, aged, it was supposed, about eighty-one years. He had been twice married; and left, surviving him, his widow, Isabella Means ; two sons, James and Samuel, and two daughters, Rachael Blair and Sarah Patton, and Sarah and Moses Mefreej children of Jane, who died before the testator, the issue of the first marriage; and four sons, Harvey, William, Henry and Albert, and three daughters, Dorcas Gordon, Minerva Foster and Isabella Brandon, children of the last marriage.
In January, 1839, the testator went, alone, to the office of his attorney, Thomas N. Dawkins, Esq., to have his will drawn. Mr. Dawkins .prepared it from the testator’s instructions, when they only were present. The will, when prepared, was read over to the testator. Mr. Dawkins had no doubt that the testator was fully competent to make the will, and perfectly understood its provisions. It bore date and was executed the 23d day of January,' 1839. Dr. Gage and Columbus Gage, with Mr. Dawkins, were the attesting witnesses. Dr. Gage had known the testator long, and thought him perfectly competent to make a will or do any ordinary business.. He had never had any dealings with the testator, nor seen him make any calculations. He saw the testator frequently; had no conversation with him the day the will was executed. He took it for granted, the testator’s mind was as good as ever. He did not discover the slightest deficiency of understanding. The testator signed the will with a trembling hand, as any old man would do. Columbus Gage subscribed the will, with the other witnesses, in the presence of the testator. He had no conversation with the testator ; knew nothing of his capacity ; saw nothing to make him doubt it.
By the will, the testator gave to his widow, for life, the use of the dwelling house and outhouses on the plantation, devised to his sons, Henry and Albert, in.which the testator, with his widow and the two devisees, had long lived, and where he died. A legacy of .$2,000 and some articles of furniture, were also *3 given to his widow. To Henry and Albert, who were appointed executors, was devised the plantation on which the testator lived at the time of his death, subject to the use of the dwelling house and outhouses by his widow, during her life. This tract contained 1,400 acres, and was valued at from eight to ten dollars an acre. The testator’s sons, James, Samuel and William, were declared, by the will, to have been advanced by the testator “ as much as I can, to make my other children equal to them ; and therefore,” nothing more is given to them. To the children of Jane Mefree, legacies of $200 and $300 are given. All the residue is directed to be sold and equally divided between the testator’s six remaining children, viz : Rachael Means, since intermarried with Blair, and Sarah Patton, children of the first marriage, and Harvey Means, Dorcas Gordon, Minerva Foster and Isabella Brandon, children of the last marriage.- The testator directed that Harvey should account for $1,800, Sarah Patton for $1,300, and Minerva Gordon for $1,600, advanced to them respectively.
On the 10th January, 1846, the testator again went, alone, to the office of Mr. Dawkins, when a codicil was drawn. The testator explained his purpose and gave a written statement to Mr. Dawkins, containing the amount of the advancements set down to each child. Mr. Dawkins thought it better that the particulars, making the sum of each advancement, should be mentioned. The testator could not remember the names of the negroes, and requested Mr. Dawkins to go with him to his wife, who was then at the house of Mrs. Brandon, her daughter, in the village. They went and got what was required, and returned to the office of Mr. Dawkins. The codicil was then drawn by Mr. Dawkins, who read it over to the testator; and it was executed in the presence of witnesses, called in to attest it. Mr. Dawlcins testified that the testator was, then, more feeble and decayed than he was at the date of the will, but was still competent to understand what he did. B. Johnson, one of the attesting witnesses, said that, at the time of the execution of the codicil, the testator’s mind was not as bright as it had been. *4 He remained some time after the other witnesses had retired, and conversed with the testator. He was satisfied the testator was competent. The testator managed his dealings well. The witness had been at the testator’s frequently, and always dealt with him. He bought, from the testator, beef, bacon, corn, etc. He never saw the testator make figures, but he always told the witness what was due. The day the codicil was executed, the testator conversed sensibly for one of his age. He said he had given off some property, 'and he wished to make some addition to his will. Henry G. Dunn, another attesting witness, had known the testator some time, and thought him competent. At the execution of the codicil, the testator was weak, but sensible, and knew what he was about. William J. Kenan, the other attesting witness, was called, attested the codicil, and went out. He formed no opinion respecting the competency of the testator; saw nothing to make him doubt it.
By the codicil, no alteration was made of the will. Only the advancements were declared which the testator had, after the making of the will, given to his several children.
The valué of the plantation of James, at the death of the testator, was $4,900. James had made no valuable improvements on it. This, with $1,300 in' cash, made the amount of his advancement $6,290. Samuel had studied medicine, and the testator, charged the expense of his education, as an advancement to him. This, with a plantation and a negro, constituted the advancement of Samuel. The property advanced to William, consisted of a plantation and crop, which he sold for $2,750, $500 in cash, and.a negro. If the negro be estimated at $500, William’s advancement amounted to $3,750. Besides the legacies to his grand-children, the Mefrees, ($500,) the testator had given to their mother a negro woman and her child, when she was married in 1828. These had increased to four. Two of them had been sold by James Means, their guardian, for $1,200, and each of the Mefrees retained one. Their father died in 1837, and they received four or five hundred dollars from his estate. The aggregate of their property was *5 $2,200 in money; and two negroes. After the death of their mother, the Mefrees, then two and four years of age, were taken home by the testator and lived with him, until they were old enough to go to school. Their negroes were hired out by their guardian. The value of the plantation devised to Henry and Albert, if appraised at $9 per acre, would be $12,609; and the share of each, $6,300, without any abatement for the life estate of the widow in the dwelling and outhouses. If to this amount is added the value of a negro given to each, (assuming that to be $600,) the share of each of them would amount to $6,800. The residuary share of each of the other children, if stated according to the evidence produced at the trial, would amount to $5,190. By the same evidence, if the will is set aside and the testator’s estate distributed according to the Intestate’s Act, the widow’s third would be more than $10,000, and'the distributive share of each of the children about $3,900; and the aggregate of the property given to the widow and her children, by the will, would be less than the aggregate sum of their distributive shares. It was admitted, however, in the course of the argument, by the counsel on both sides, that a statement of the relative amounts which the widow and her children would receive under the will, compared with what they would receive in case of intestacy, made according to the evidence produced, would exhibit an interest against the will, greater than the facts would warrant. But even according to the statement of the counsel for the appellees, then made, it appeared that the widow and her children would receive about the same amount, whether the will was established or set aside ; while it is manifest, by any statement, that the widow will take less by the will, than if the testator had died intestate.
James became of age in 1816, and managed the plantation affairs for his father until 1S27, according to one witness; Rachael Blair said, about seven years. William managed from the time Samuel left, until 1836 ; and Henry and Albert from 1836, until their father’s death in 1847. It did not appear that the two first received any compensation for their services. Before *6 1846, Henry and Albert received one-fifth of the cotton crop, which was variously stated to be from thirty to fifty bales. In 1846, the testator agreed to allow them one-fifth of the whole produce of the plantation.
James and Samuel Means, and the infant children of Jane Mefree, contest the will, and are the appellees in this Court. Rachael Blair is not a party to the cause, but appeared as a witness for the appellees, on her statement, which was admitted, that she would get more if the will was established than if it was set aside. William Means is satisfied with the will, and the other distributees do not oppose the probate. Henry and Albert propound the will.
The allegations against the probate of the will are, first, that the testator did not possess sufficient memory and understanding to make a will; and, secondly, if the testator did possess sufficient capacity to make a will, that which is propounded was procured and effected by the undue influence and coercion of Isabella Means and of her sons Henry and Albert.
There have been three trials of this case, which have resulted in three verdicts against the will. A great mass of testimony has been accumulated, which it wóuld be impossible, within any reasonable limits of an opinion, to review and examine in detail. It is intended only to advert to the principal facts and circumstances offered in evidence in support of the allegations against the will.
Before detailing the evidence in support of the first allegation, I will observe that, by law, every man is presumed to possess sufficient intelligence for the conduct of his affairs, and for the disposal of his property, by barter, sale or gift; and if a will is impeached on account of the alleged incapacity of the testator, it will be incumbent on the party impeaching it, to- establish the incapacity by the clearest and most satisfactory proofs. 1 'Jarm. on Wills, 17.
John Gall — “Moved into the neighborhood of the testator in 1836 ; after which time, the testator never transacted his own business.” This statement is contradicted by the whole current *7 of the testimony. In speaking of his property, “the testator said he would divide equally among his children.” John Wright kept a store in the neighborhood of the testator, and knew him since 1823. He testified, that the testator “was of a dull mind in most matters.” He means, the testator could not comprehend the value of his estate. “ That the testator’s property was scattered, would increase..the difficulty with some men. He would not think, from what he saw, that the testator had capacity to understand the provisions of his will. The testator seemed not to have confidence in his own judgment; rarely did much without assistance.” That the testator could comprehend the disposition of his property, is proved by the fact, that he went alone to his attorney, and gave instructions for drawing the will. It was very easy to understand the devise of the plantation to Henry and Albert, and of the residue equally. The testator did know what advancements he had then made; for they are correctly stated in the will. His property was not then “ scattered.” The principal advancements were made after the will was executed. It was proved that James had recived his full share, as stated in the will: William was satisfied with the will. No evidence was offered to show that Samuel had not been advanced in his education and the property given to him, as much as a child’s share. The testator frequently asked this witness “to make calculations for him.” That furnishes no evidence of testamentary incapacity. To be able to cipher, is not a qualification necessary to the making of a will. It would limit testamentary capacity to a comparatively small number, if all who cannot calculate the interest on a note, or make other simple calculations, were incompetent to make a will; especially if women were included in the rule. To show that ciphering is not indispensable to the transaction of business, the testator was a money lender to a large amount. In 1844, five years after the execution of his will, it was proved that the notes which he held amounted to near $5,000. There was no proof that he lost anything by imprudent loans, or by any neglect in collecting the interest or the principal. The testator was the treasurer *8 of a fund, contributed by a religious. society, for some purpose, connected with a grave-yard ; and he was directed to put out, át interest, a balance which remained. This fund he continued to lend out until his death ; after which, it was paid over to the congregation. By this trust, the member's of the society certified to his capacity for business. “The testator often asked the witness concerning persons, living near by, ‘Who is that?”’ It is not surprising, that an old man, who was withdrawn from the active scenes of life, should be less familiar than a store-keeper with the persons of his neighbors. While this witness testified against the testamentary capacity of the testator, he said the testator was a commissioner of the free schools ; had been appointed, four or five years before his death, by the Court of Equity, a commissioner to value lands; and had acted with the witness in the appraisement of several estates ; was possessed of a good property, which he had made ; had sold one negro and bought one and a horse, within a few years before his death; and to complete the inconsistency of his testimony, he deposed that “he would not have hesitated to trade with the testator for his whole estate; because» he knew the testator to bé a careful and prudent man.” A treaty for the sale of the whole of the testator’s estate required memory and understanding much greater than was necessary to dispose of it, by gift. Besides a clear comprehension of every particular of the estate and' of the aggregate, a treaty fpr sale would require k valuation of every particular, and the addition of the particular' values into a sum total. A less degree of capacity is required, by law, to make a will than to make a contract; so, that a will maybe supported, when a contract would be set aside. In Kindleside vs. Kindleside, 2 Phill. 449, Sir John Nichol says, “ the Court relies little on the opinion of witnesses ; but looks to the grounds on which the opinion is founded ; And is guided in its judgment by facts proved and by acts done, rather than by the judgment of others.” The testimony of Wright exhibits the danger of relying on the opinions of witnesses respecting testamentary capacity. In most instances, the opinion of a' witness is only a *9 reflection of his bias in favor of one of the parties. In giving his opinion, the witness may safely indulge his partiality. There can be no imputation, nor conviction of perjury for a false opinion. Very few witnesses, who are interrogated on the subject, know what degree of capacity is necessary for the making of a will. Some may suppose the highest degree of intelligence is demanded; while others may think the least degree is sufficient. The standard by which many will answer, is adopted with reference to a decision of the case in conformity with their wishes. This may be done, not dishonestly, but unconsciously. Nothing is intended, in these remarks, personal to the witness. I have no reason to believe he did not express his honest conviction. Benjamin Arrowwood said that, “ once, talking about Fair’s will, the testator said he wanted no such doings about his estate. The witness said, perhaps, you have made a will. The testator said, ‘No ; the law makes a better will than I could. My feeling is, to make all my children equal.’ The witness said, £You know, it is given out, in the neighborhood, that you keep an account of what you have given to each child.’ The testator said, ‘No; I leave each to do that for himself.’ ” The witness never saw the testator make a calculation. He refused to receive payment of a note from the, witness until Foster had calculated the interest. James Thompson quarrelled with the testator in 1837. The testator was not then competent to dispose of his property. The testator could not make calculations. He could make trades, and trade well. Dr. Morris Moore— The testator could not make a statement of the grave-yard fund, and got another to make it. The witness went one day to the testator’s house, who was sneezing violently, for half an hour; and when the fit was passed, he neither cursed, nor ■prayed. “From this, the witness inferred the testator was of a dull and phlegmatic mind.” The testator complained to the witness, that he could'not satisfy all his children; and said he was, at times, sorry he had anything to leave. The witness said, “Don’t be troubled; do justice. I suppose you wish to do equally by all.” The testator said, ‘Yes;’ and that James and *10 Samuel had got their shares.” The witness advised the testator to g'ive some property to Rachael. The testator said he could not; because she could not keep it at his house, where Rachael then lived. ' Two or three weeks after this, the witness went to the testator’s house and told him, that money might be given to Rachael, so that she might have the .interest. The testator seemed not to recollect the former conversation, and said, “ Oh, I have given her some money,” meaning pocket money. The testator seemed not then inclined to talk about his affairs. This satisfactorily explains the testator’s seeming forgetfulness. The witness said, “he had no idea, that the testator.could comprehend the disposition of his property. He did not think the testator could divide what he had left.” Yet, he described the testator as “ of moderate capacityhad bought corn from him and paid for it; the testator did buy and sell negroes; ‘and the witness “ would have bought anything from the testator which he would have traded.” Charles Cunningham — The testator told the witness, three times, that he had his “business fixed;” that is, his will made. He spoke of paying Dawkins. “ He reckoned his business was fixed now, so it would do.” After-wards the testator said, “I don’t think James K. and Samuel will get any more.” The witness said, “ They have not got much yet.” The testator replied, “ Oh, yes ; I have given them money, a heap. Agin the rest are made equal to them, there won’t be anything left.” “As to his will, the witness did not think the testator was scholar enough to have figured it up. The property was given off and scattered. The testator had not mind enough.” Yet, the witness described the testator, as seventy-three or four years of age, when he died, which would make him about sixty-four or sixty-five years old, at the date of the will — and not much beyond that age at the date of the conversations which the witness narrated. He also said, “The testator was not one of our smart men;” that “he, the witness, was not able to make a will; thinks his mind stronger than the testator’s. He could not make a will of the testator’s property.” This witness does not state a single fact by ’ which the correct *11 ness of his opinion, respecting the testator’s capacity, may be tried. If his confession, that he had not capacity to make a will, be taken against him, he is of too feeble understanding to form an opinion of the testator’s capacity. He says the testator made a good estate; admits he was a stout, healthy man of his age ; and mentions no mental disorder nor debility by which his mental faculties were impaired. It is not credible, that the intelligence which is sufficient to make a fortune, is unequal to the disposition of it. It is impossible to conjecture, by what standard of testamentary capacity the witness formed his opinion. It would seem, that he thoughtnone but “one of our smart men” was capable of making a will. William Irammel testified that, in 1839, after having been at the Court House, the testator said, ‘ We have been at the Court House, making a sort of a will.’ ’ The testator often told him, that ‘he allowed the land for the boys, (Henry and Albert) but he did not know what good so much land would do them, without anybody to work it.’ He said‘he allowed Samuel had his share; that money was spent in his larninSamuel was educated for a Doctor, but did not practice. James, the testator said, was the best child he ever had; managed best. William was contrary. When the testator gave up James’s note to him, (being for the $1,000, charged as an advancement) he said, ‘I reckon James and his wife will now let me alone, as long as I live; if anything more were coming, he will get his part at my death.’ Rachael Blair is the daughter of the testator. Since his death, she has lived with James K. Means. She will not receive as much, if the will is set aside, as if it stands. “In 1827 or 8, her father was very low, and her cousin, Harvey Means, came to make his will. Harvey proposed it. Her father said he would think of it. Harvey returned. The testator said he did not know how to make an equal division of his property'; that the law would make a better will than he could make. Before Harvey came back, mother said, the old man did not know how .to make a will. When Harvey came back, mother had a paper, dividing the negroes. Harvey said he would have nothing to do with *12 it, if it was to be done that way. We talked, that mother had taken the best part for herself and her own children.” Rachael Means and Harvey must have thought the testator competent to make a will when they proposed it to him. What was said by the testator, and by his wife, about his inability to make a will, is contradicted by the testimony of this same witness, when she said, “the testator was in bed when Harvey came to make the will, and very low. All the neighbors thought that he ought to make a will. All thought that he could, then, make a good will.” The testator had been stout, but failed much in the last ten or fifteen years of his life. He complained much before 1844, but rode about to the last. He had several spells of fever. “Has heard mother say that James K. and Samuel had got their share; and father would reply, ‘that is your notion.’ ” The testator had told other persons, that James K. and Samuel had got their shares. His reply to his wife does not import his dissent from her statement; and could, therefore, have been intended only as a reproof to her for interfering with the subject. It is apparent, from all the testimony, that the testator’s will and the disposition of his property was a subject of irritation in the family and of distress to him. The witness “ has never heard the testator say James K. and Samuel had got their share.” This is explained by what has already been said and by her own statement, that “ she never spoke to the testator about his will. She had heard he had one; but did not know it till mother told her in 1845.” “ The fall before the codicil, mother told her that the testator had made a just will; one that all would be satisfied with, that were satisfied with just things.” “About the time of Mrs. Brandon’s marriage, father said he wanted his business fixed. He did not know what he had given to each. He wanted each to have an equal part; seemed much distressed. The witness proposed that her father should fix it while he lived ; and that each should give in what had been given off. Mother said, father did not want to give off any more negroes. The witness proposed that the testator should give money. Mother said, no money should *13 go.” “ The testator did not recollect what he had given. Mother told him, neither of them could calculate with figures.” The time of Mrs. Brandon’s marriage was not mentioned by any witness. It was in 1845, (according to Wright) that testator gave off much of his property. The “ fixing of his business,” of which the witness speaks, must refer to the making of the codicil, in which the greater part of the advancements are charged. At that time, they exceeded $12,000, in negroes and cash ; and- were made at different times and in various amounts. The testator’s inability to recollect so many details, does not show a defect of memory and understanding, such as would disable him from making a will. In such a case, the law permits an educated man to aid his memory by written memoranda. The testator might equally aid his memory by the recollection of his wife and children, without any impeachment of his capacity. It was only important, that the several advancements should be correctly stated; and that was done. But the will, made seven years before this time, and not the codicil, is the subject of contest. The appellees are not interested to dispute the codicil.
I have, thus, collated and reviewed the testimony by which the appellees attempt to support the allegation of the testator’s incapacity. It is uncertain, whether the opinions of the witnesses respecting the testator’s incapacity were formed before the making of the will; and the same uncertainty exists as to the time when the incidents occurred, from which their opinions were formed. . It has been shown, that no reliance should be placed on opinions, when the facts are not stated by which the opinions may be tried. It has also been shown, how inconsistency, and ignorance or misapprehension of what constitutes testamentary capacity, characterize the opinions of the witnesses ; and, in some instances, how frivolous and inconclusive are the facts and incidents which they mention, in support of their opinions. Every witness relies on the fact, that the testator could not cipher, nor add up or divide, in figures, the value of his estate, as proof of incapacity. Against the opinions of *14 witnesses, that he could not comprehend the distribution he had made of his property, is opposed conclusive proof that he did, from the fact, that he gave instructions for the will, without any assistance, and that the whole property is disposed of, by the will, without the least confusion, and, in a manner, consistent with the intentions of the testator, frequently declared before and after it was made.
Before I proceed to collate the testimony for the appellants, I will try the competency of the testator to make his will by the evidence of capacity which is afforded by the provisions of the will, itself. If it is questioned, whether a man can do a certain act, all opinions against his capability are falsified by proof that he has done the act. This is the conclusion of common sense, and it is equally a conclusion of law. In Cartwright vs. Cartwright, .1 Phill. 90, a lunatic, whose hands were untied to gratify her clamorous and violent desire to make a will, did write it, with many circumstances of phrenzy in her behaviour, at the time she was writing. Her keeper testified, that the testatrix was not sane when she wrote the will. Yet, the will was established, on the proof that “ it was written in a remarkably fair hand, without blot or mistake in a single word or letter which manifested deliberation; and, because f4it was a'proper and natural will, and conformable to what her affections were proved to be, at the time; and her executors and trustees were very discreetly'appointed.” From a rational act, the Court inferred a rational mind, and a lucid interval, though it were only for the short period of time employed in writing the will. By-the same conclusive reasoning, all opinions against the competency of the testator to make or comprehend the provisions of his will, must yield to the proof which the will itself affords, of a perfect comprehension, in all its details, of the distribution of the property which is made by it.
The will disposes of the property of the testator, in a manner consistent with his repeated declarations, proved by the witnesses for the appellees ; and with just and considerate attention- to the claims of his children and the situation of his family. . *15 He had declared that James, Samuel and William had been •advanced to the amount of their shares, and that they would get no more, by his will. The declaration is repeated in the will, and assigned as a reason why no more is given to them. It was proved, that James had received his full share; and the statement, in the will, is uncontradicted by Samuel and William. The testator declared that he intended the plantation, on which he lived, for the boys. It is accordingly given to them. He declared that all his children should be put on an equality. This has been substantially done. The residue of the property is bequeathed to be equally divided, and to secure equality, the children advanced are required to account for their advancements. The inequality, which may, at this time, be shown, is not greater than may be accounted for by the fluctuation in the value of .property, since the will was made ; or, by differences of opinion in its valuation. A home was provided for his aged widow with her two youngest sons, who alone, of all her children, remained unmarried; and the homestead, endeared by association and habit, was secured to her, for the few remaining years of her life, with the comforts and conveniences she had gathered about it. The estimated value of the plantation, devised to Henry and Albert, would make their shares greater than the shares of the others; but the saleable value of it, encumbered with the widow’s life estate, would be much less than it was estimated by the witnesses, who made no abatement on that account. Even if their shares were as much greater than the others’, as the appellees complain, it cannot be accounted as any evidence of incapacity, that the testator should provide more liberally for his youngest sons, to whom he had committed the care of his widow in her declining years. While the provisions of the will are consistent with the repeatedly declared intention of the testator, they are also free from any confusion or mistake. The most simple person might execute it. When it is proved to have been made in pursuance of the instructions of the testator, without assistance from any person, the instrument itself, affords the strongest proof of his capacity.
*16 This review of the case made by the appellees, on the allegation of testamentary incapacity, shews that the verdict of the jury is wholly unsupported by evidence. A summary of the evidence against the allegation, will dispel any shadow of doubt which might remain. Herod Gibson had known the testator forty or fifty years; lived near, and saw him frequently. He saw no change in the testator until 1846 or ’6. Dr. Hicks had practised in the testator’s family, two or three years after the will was executed. He hunted with the testator; fished with him ; rode over the plantation with him; had much talk with him about farming and other subjects ; was often at his house. Nothing excited any doubt of the testator’s understanding. Thomas. Gist saw him frequently, from 1841 to ’44; rode with him often ; and would .have dealt with him as readily as with any man. F. W. Eison acted with him as appraiser of Howard’s estate. He acted as one of good understanding ; nothing induced, the, witness to suspect deficiency. William Norris knew the testator, twenty years; in 1842-3, had transactions with him. He was then a man of ordinary mind; nothing induced the. witness to suspect a deficiency of any of his mental powers, beyond what every man of his age is subject to. He was of good sense — did his own business well. Nathaniel Gist was in his neighborhood in 1840 and before, and sometimes at his house; remarking nothing indicating weakness of mind. William Little■ — In 1835, there was no deficiency but old age. For the last three or four years of his life, he seemed to fail. Witness saw him frequently ; would, at all times, have traded with him. ' Charles Me Whorter lived within three or four miles of him ; saw him frequently for many years. In 1842, the witness conversed with him about the affairs of the estate of the witness’s father. He talked very reasonably; witness would have traded with him: thought him competent. Jesse Hyatt knew him twelve or thirteen years; saw him frequently, passing about. In 1844, saw him make a' horse swap. The conversation about it was continued half to three quarters of an hour. In the latter part of 1844, the witness and Albert were talking *17 about a horse' trade, if the old man was willing. The trade was concluded by the testator, who delivered the wheat which he proposed should he taken, instead of money. William Beaver lived one and a half miles from him; had frequent trades. In the fall of 1836, borrowed from him the surplus of the Grave-Yard fund, and kept it until 1842 or ’43. He had the note renewed every year, bringing a renewal, with the interest calculated. He told the witness the money was wanted. It was proposed to pay a part; this was declined, until the witness promised to pay the balance at Shrink’s sale. He attended there with the note. Thomas Fowler liypdfifou^ miles off; knew him well; returned money borrowed *hes< knew the amount. In 1845 or ’6, he wanted ^hoe^akeij/and'^ame to witness to recommend one to him. ;-In^846,’(,#e capte tolydtness about hands to help him in cutting'%lifeat; said hls/boifs had got behind. Yfitness knew him as he^l>ic| an/ body in the neighborhood; never noticed any '\veál^jess^tn lyé'Vmind ; he was competent to trade; drove a hd.rgpny.^íí. Samuel Mayes lives within four miles; knew him as long as witness could remember. Witness has done much work for him ; never discovered any defect or failure in him till 1845. L. B. Mus-grove made a gin wheel for the testator in 1843 or ’4.. He came several times to see about it; after which, an agreement was concluded. The witness was employed in the work about three weeks. The testator was at the mill every day. He had a clear head in making the contract.
The testimony of these twelve witnesses, added to that of the attesting witnesses, is sufficient; to establish, in the most satisfactory manner, the testamentary capacity of the testator.
The other allegation against the will, is, that it was obtained by the undue influence of Isabella Means and of her sons Henry and Albert. The testimony, in support of this allegation, will be briefly detailed. John Galt — When he would speak to the testator, he would say, “ go to the boys; if they will do, well. I have nothing to do with the business.” And again : “ they have their own way; won’t mind me ; I can’t control them, and *18 have quit trying.” The testator gave some directions in the field, which he complained Henry would not mind. On witness speaking to Henry about it, he said, “ the old man is troublesome ; we get on our own way; he is hard to get along with.” Benjamin Arrowwood frequently heard the testator say, he could not have his own way. As the witness plowed, he would frequently ride along in a furrow and chat; has done so for hours. When asked how they got on at home, he would say, “ I don’t know; X don’t have my way.” William Campbell often heard the testator speak of his affairs; “ said that the hoys would not let him have his way; would not let him whip the negroes when he pleased; would never tell him what they were doing ; he had himself and old Ball, and no more.” When asked for help, he would say, “ go to the boys; I have nothing to do with it.” He would ride along by witness, as he plowed ; “ said he had nobody to oversee but the witness ; they would not let him oversee at homesometimes he would cry. “ The testator was talking how they fretted him; said he would as soon lie down behind that log and die, as go home.” This was said several times. Charles Cunningham has heard the testator speak of young negroes sent off; said, “ they were keeping only old ones to make a support;” that “he had nothing but old Ball (a small horse) ; that the boys had taken every thing else;” crying when he said so. “As the witness plowed, he would ride along, talk and cry. Said he had no control; could not have his own way; the boys would not attend to him.” Rachael Means — Henry and Albert said to the negroes, “ don’t mind him ; mind us, or we will whip you.” “ Father said they would do merely to contrary him ; would not do any thing he wished, even if it was right. Once, in 1846, the testator got on a horse with Tom, a negro boy, behind him. Henry told Tom he should not go, and ordered him down. Father said ‘no.’ After a while, Tom got down, and Henry whipped him for not getting down sooner. Father said, ‘ you had better drive me off the plantation !’ Tom had frequently gone with father. We did not think it safe for him to ride by himself, after having had *19 a paralysis. Tom ■ was, then, six or eight years old. Father would sometimes fall off his horse; and Tom would run to' make it-known. Sometimes, father struck Tom with a stick. He would be fretted when the negroes would' not mind him; and witness has sometimes told the little ones to keep out of his way, when he was angry. He would throw at them, but never hurt any. Has heard Henry sáy to father, ‘ shut your mouth, or I will stamp you;’ witness interfered, and he said, ‘hush, or I will stamp you.’ Charles Cunningham — “ When the testator was fretted, he was right rough. Henry and Albert were good managers ; made good crops. All the family were industrious and saving. There were times when the boys had a rough time; but the old man was aggravated by his sons. Henry would not answer his questions. Benjamin Hardin slept in his wagon, near the testator’s house. Henry and Albert, at night, found some negroes at the wagon. The witness had given one of them some whiskey. Henry and Albert gave him a whipping. Afterwards, the testator said, he was sorry for it; and if he could have had his own way, it should not have been done.
The circumstances produced in evidence to establish the undue influence of Elizabeth Means were, that she told John Galt to buy a cheap horse for the testator. When the terms of a horse trade were agreed on, testator' said, “Stop; let me see the old woman.” She said swap, “if the bridle is thrown in.” The swap was made. Galt said, “ she had what she wanted; controlled when she pleased ; the old woman-and boys ruled about the house.” Wright said the testator spoke to him of James ; said he had not given James as much as he should ; ought to give him a negro. His eyes filled with tears. The witness told him to buy a negro. The testator said, “ I can’t do that; they watch me too close.” The witness was, occasionally, at the testator’s house; knew of no special control of the old woman. The testator was easily influenced; witness had no reason to suppose he was influenced. The testator took a spinning machine, on trial; insisted on his wife’s keeping it, but she would *20 not; so Benjamin Arrowwood bought it. He knew no other instance of her influence over the testator. James Lee, in 1846, went to buy corn. The testator said, he had none. She said, “We have com to sell, and you can have it;” so he bought ten bushels, and the testator delivered it to him. Dr. Moore proposed that the testator should take a trip to Columbia, with the witness. She objected that he was too old and feeble, and could not stand the trip. ' After some chat, witness said, “well; what about the trip?” Testator answered, “the old woman won’t let me go.” An old oak stood in the grave-yard. Some wished it down — some, not. Testator told his negroes to cut it down. She said, “ Oh, spare the old oak ;” and he told the negroes to stop. An old shoemaker had lived with the testator, twenty years. He was a slow working man. His house was burned. The next morning Charles Cunningham heard her say, “ I have wanted Carson away; and, now, he will have to go.” tie has heard the testator frequently say, “ if he had his own way, Carson should not have gone. Carson had taught Bob to make shoes.” She said, “ we have no use for Carson now.” Rachael Means — “Mother was a sensible woman; would not be satisfied if she did not have her way. If she could not do, one way, she would try another, and keep on until she succeeded in any thing of importance.” “ She almost always joined her sons, if there was any difference between them and father.” “ She wanted father to give Henry money to buy a negro. He said, they, were always wanting money; never satisfied. She said that he, then, gave Henry $200. She afterAvards proposed that Henry should give back the $200, and receive the boy, Berry. Father said he did not think it was right to give off property, after he had made his will. She said, that any thing he did, in his life-time, would stand. The witness understood that a deed of gift of Berry was made to Henry. Mother, on a journey to Georgia, lost her trunk. A man was indicted for stealing it. It was taken to court, in her name. Father and his wife went to Pickens together. The case was thrown out, because it was thought she was a widow. Mrs. *21 Wilson, (a daughter of Mrs. Means, by her first marriage,) when she was married, carried off three times as much as Sarah Patton.” Frequently, things were sent to Mrs. "Wilson. Mrs. Means sent her money, several times ; witness don’t know how much. Mrs. Means sent her feathers, two or three times.
Such is, substantially, the evidence by which it is attempted to support the allegation, that the will propounded is void, because it was made by undue influence.
The influence, which, in the legal sense of the term, is undue and sufficient to invalidate a will, must be so great as to constrain the inclinations of the testator, to overbear and conquer his will, and make, him the obedient, though reluctant agent of another’s dictation in the testamentary disposition of his property. His free agency must be overcome, so that the instrument does not express his will, but the will of another. The subjects of such influence, are persons naturally of weak and imbecile understanding, or so wasted, by age or disease, that they are deprived of the strength of their faculties. The means by which such influence is obtained, are excessive flattery, assiduous and artful compliances, whereby the testator is deceived and seduced from his purpose ; or excessive importunity, which wearies out opposition, and constrains the testator, for the sake of quiet and repose, to yield what he has not the strength to refuse. Undue influence is that which is opposed to the will of the testator. The influence, which, by operating on the mind and affections, creates a motive for action — in fact, forms and constitutes his will. Such influence, if it be not vicious or immoral, is not illegal. A will cannot be set aside, because it is made under the influence of duty, gratitude or affection; which prompts the testator’s bounty in favor of the person towards whom those feelings are entertained. Such motives are virtuous and commendable ; and they are all combined in the influence of a dutiful and affectionate wife, by which her pleasure becomes her husband’s will. ,
A testamentary disposition of property may also be set aside, as opposed to the will of the testator, when it is proved to have *22 been made under the operation of force or fear. But proof of the most predominant power and control over the testator, by whatever means it may have been obtained, can avail nothing to invalidate a will, unless it is shown that such power and control were actually exerted to dictate its provisions. The corpas delicti must be discovered in the will, itself; manifested by unnatural, unjust or disproportionate donations, which may be traced to the exertion of such power by the possessor, for his own advantage, or the advantage of others for whom he is interested.
To apply this law, first, to the case made against Henry and Albert Means. Nothing can be more opposed to flattery and importunity, than the conduct of Henry in the circumstances related by Rachael Blair and other witnesses.
The only charge of undue influence which the evidence can support against Albert and Henry, is that of fear or intimidation. The law, on this head, is that, “ if a man, by reason of some present fear or violence, or threatening of future evils, does, at the same time or afterwards, by the same motive, make a will, it is void.” 2 Bac. Abr. 203. The complaints of the testator, that he had nothing left to him, but old Báll; that the boys would have their own way ; and would not mind anything he said and other expressions to the same effect, and his crying, are most properly attributable to transient petulance and depression. Few parents, who have lived as long, do not make the same complaint, that the energy and self-confidence of youth will not be governed by the timid counsels of old age ; and that boys will have their own way, heedless of parental remonstrance. The undutiful behaviour of Henry, according to Rachael Blair’s account of the whipping of Tom, occurred in 1846, long after the will was made. No imputation of rudeness is made against Albert in any part of the testimony. All the complaints of the testator respecting Henry and Albert proceed from their disobedience or disrespect. The testator was in no fear of either of them. Cunningham, who narrates the complaints of the testator, says also, that “ when the testator was fretted, he *23 was right rough. There were times, when the boys had a rough time. He thinks Henry had a hard time; when thé old man rvas contrary a very rough time.” There is no evidence of any threats, intimidation or rudeness by either of the young men before the making of the will. That the will was not made under any such influence is further proved by the testator’s frequent, free and voluntary declarations of his intentions respecting his will. But it needs no other demonstration to show that the testator, in giving his property as he did, by his will, acted from no fear of his youngest sons, than the fact, that it does not appear, and it is highly improbable, that they knew when the testator made his will; or even that any will was made. Rachael Means, who was a vigilant observer of everything which might affect the interests of. her branch of the family, never knew a will was made, until 1845.
I shall not recur to the facts and incidents which are adduced t,o establish Mrs. Means’s undue influence over the testator. They are trivial and frivolous when considered with reference to the conclusion they are introduced to establish. It is enough to say that they have not the slightest tendency to influence the mind of the testator in the disposition of his property by his will. There is not the least evidence of artful, designing compliances, nor of the least solicitation, much less of importunity, to procure from the testator any favor for herself or her children by his will. Oncé, in 1828, she suggested the arrangement for a will; but it was rejected by Harvey and Rachael Means as too favorable to herself and her children ; and once she was rebuked by the testator for interfering with his will, when she said James had received his share. These are the only two instances of her approach to the subject of a will which Rachael Blair’s jealous observation of Mrs. Means’s conduct, could detect and bring to light, during the many years of her marriage with the testator.
But it is unnecessary to dwell longer on this topic. The will itself, by which the charge must he substantiated, refutes, incontestihly, the allegation that it was made by Elizabeth Means. *24 It is in vain to prove influence, even undue influence, sufflcient to invalidate a will; if no trace of such undue influence can be found in the will. If Mrs. Means and her children had been unprovided for by the will, how could the will be ascribed to her undue influence ? The allegation of undue influence is flagrantly inconsistent with the fact that, by the will, the widow does not receive one-third of what-she would take, if it had not been made ; and that the aggregate of the provision, made for her and her children, by the will, does not materially exceed, if it does at all, what they would have taken, if her husband had died intestate. If this will was made under the influence and dictation of Mrs. Means, it exhibits a disinterestedness and sense of honor of which many women, in her situation, would prove themselves wholly incapable.
The burden of the argument against the will, has been, that by it, injustice is done to James, in charging the plantation, which the testator bought for him, as an advancement, and which he claims, as compensation for his services. It was suggested in the argument, before this Court, by one of the counsel for the appellees, that this protracted and harassing litigation might be adjusted and ended by granting a new trial, unless the appellants would consent that James should keep the plantation, and account only for the advancement of f1300, in cash. The position of the appellants makes such an order impracticable, even if the Court were inclined to grant it. The suggestion, however, confirms what has been charged to be the fact, by the counsel for the appellants, that this litigation is prosecuted for the sole benefit of James. There is not a particle of evidence to show that the testator ever recognized any claim of James for compensation, while he lived with the testator. William, a son of the second .marriage, was not allowed any compensation ; and the plantation, given to him, by the testator, under similar circumstances with the gift to James, has also been charged as an advancement to William. During the time of their management, the testator was in his vigor, and their services were far less important than in the testator’s declining *25 years ; when the charge of the plantation was devolved on Henry and Albert. The compensation they severally received, estimating cotton, at 8 cents, per lb., varied from $75 to $125, a year. The value of James’s plantation if retained by him, would be a greatly disproportionate compensation for his services, compared with what was given to Henry and Albert.
In deference to three verdicts of the jury, and to vindicate the Court in granting a third motion for a new trial, I have endeavored, by a review and examination of all the testimony submitted on the issues, to make it manifest that the verdict is wholly unsupported by the evidence; and that the provisions of the will are considerate, just and equal; such as not to give to the appellees any just ground of complaint. But the only proper and legitimate question, on the issue presented, is, was the will propounded the last will of the testator, James Means ? If it was his deliberate and intelligent act, it is equally the duty of the Jury and of the Court to sustain and give effect to it. Every man has, by law, a perfect right to dispose of his property by will, in any manner he may see fit. The legatees and devisees are invested with as absolute and indefeasible title as the most solemn deed can confer. When a valid will is set aside in consequence of the misapprehension of the Jury, or from any other cause, it is the duty of the Court to re-establish it. If the Court does not constantly and firmly perform this duty, the property of the citizen may be wrested from him under the form of law. The verdict is so wholly unsupported by the evidence that the Court is constrained to grant the motion for a new trial.
O’Neall, Wardlaw, Witheus and WhitneR, JJ., concurred.

Motion granted.

 Hon. Josiah J. Evans was elected united States Senator, and resigned during the Term. Hon. Thomas W. Glovee. was elected in his place. Judge Evans sat a few days at the commencement and Judge Glovee a few days at the close of the Term.